IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERNESTO SANTIAGO,
    Plaintiff

  v.              CIVIL ACTION NO. 04-335 ERIE

UNITED STATES OF AMERICA,
    Defendant

        STATUS CONFERENCE

Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Judge's Chambers, U.S. Courthouse, Erie,

Pennsylvania, on Friday, April 21, 2006.

APPEARANCES:
    ERNESTO SANTIAGO, Plaintiff herein, (via Phone).

    NEAL R. DEVLIN, Esquire, (via Phone), appearing
    on behalf of the Plaintiff.

   PAUL E. SKIRTICH, Assistant United States
Attorney, (via Phone), appearing on behalf of
the Defendant.

   DIANA LEE, Deputy Regional Counsel, (via Phone),
Federal Bureau of Prisons.

   Ronald J. Bench, RMR - Official Court Reporter

2

1   P R O C E E D I N G S

2

3   (Whereupon, the proceedings began at 10:06 a.m., on

4 Friday, April 21, 2006, in Judge's Chambers.)

5

6   THE COURT:  Now, let's go around the horn here --

7 Mr. Santiago?

8   MR. SANTIAGO:  I'm present.

9   MR. DEVLIN:  Neal Devlin here.

10   MS. LEE:  Diana Lee, agency counsel for the Bureau

11 of Prisons.

12   MR. SKIRTICH:  Paul Skirtich, and with me is

13 Attorney Phil O'Connor from our office.

14        THE COURT: Okay. Just to set the stage for this,

15   by way of background the defendant had filed a motion for

16   summary judgment and supporting brief back in December --

17   actually, I think on December 23rd of '05. Based in part on

18   the plaintiff's failure to have obtained a medical expert in

19   support of his Federal Tort Claims Act claim, which essentially

20   alleged negligence with respect to the treatment of a staff

21   infection. Shortly thereafter, our chambers contacted the Knox

22   firm in an attempt to enlist Mr. Lanzillo to see if he would be

23   willing to enter an appearance on behalf of Mr. Santiago for

24   the purpose of exploring or attempting to obtain an expert

25   report. By motion dated March 2nd of '06, Mr. Lanzillo filed a

                                    3

1   motion for extension to submit an expert report, indicating

2   that he thought the review could be completed by April 15th.

3   All right, Mr. Devlin, where are we now?

4        MR. DEVLIN: Your Honor, we have submitted all of

5   the medical records and having engaged an expert, and we did

6   speak to that expert, unfortunately, we are not going to be

7   able to call that expert and we're not able to obtain an

8  opinion from that expert. They did do a review, having gone

9  through the normal due diligence -- in getting them all the

10 information they needed. However, we are not going to be in a

11 position to submit a report. We would not intend to call this

12 expert at trial, which I haven't given you the name. And based

13 upon our inability to get that report, your Honor, which we

14 already discussed with Mr. Santiago, we would be requesting we

15 be allowed to withdraw as counsel because without that report,

16 we don't believe we can continue in this case.

17         THE COURT: Would it be accurate to say that when

18 you say you were unable to obtain an expert report, you were

19 unable to obtain a favorable expert report, is that what you

20 mean?

21         MR. DEVLIN: Your Honor, we were unable to obtain a

22 report, yes, your Honor, that is what we mean.

23         THE COURT: You were unable to obtain a report that

24 substantiated the allegations of medical malpractice, is that

25 essentially it?

4

1          MR. DEVLIN: Your Honor, yes. I hesitate to say

2  because I'm not sure, obviously, what Mr. Santiago plans on

3  doing in going forward.  But using all the due diligence we

4  could, that is accurate, your Honor.

5       THE COURT:  You have discussed this with Mr.

6  Santiago, is that correct?

7       MR. DEVLIN:  Yes, your Honor.

8       THE COURT:  Mr. Santiago, do you understand what Mr.

9  Devlin has just been saying?

10       MR. SANTIAGO:  Yes, I understand everything.  I

11  spoke to Mr. Devlin and Ms. Watson about myself trying to

12  get -- I'm no longer in segregation.  Mr. Devlin said we're

13  going to file a motion to withdraw, I was waiting to hear from

14  that.  I would ask this court to give me 60 days to get my own

15  report from an expert, now that I'm no longer in segregation I

16  can write and call people more freely.  I probably will be

17  asking Barbara Zeller, who wrote the warden at FCI McKean, to

18  give her report.

19       THE COURT:  Who is Barbara Zeller?

20       MR. SANTIAGO:  She's part of the exhibits, where she

21  wrote -- she's a medical doctor out of New York, she wrote the

22  warden saying I should have gotten more tests, that was

23  ignored, that was part of my exhibit.  It's in the complaint as

24   well.

25           THE COURT:  All right.  Off the top of my head, I am

                                5

1  unfamiliar with this particular letter, do you know what he's

2  talking about, Mr. Skirtich?

3           MR. SKIRTICH:  I do.  This is a letter that Dr.

4  Zeller wrote to the warden -- I don't have it in front of me,

5  judge.

6           THE COURT:  What is the upshot of the letter, what

7  does she say?

8           MR. SANTIAGO:  I have a copy if you want.

9           MR. SKIRTICH:  She talks in general about treatment.

10  She never saw Mr. Santiago, nor did she view any of the medical

11  records.

12           MR. SANTIAGO:  I did forward her a copy of the

13  medical records.

14           THE COURT:  Is this letter the functional equivalent

15  to an expert report?

16           MR. SANTIAGO:  I have it right here.

17           THE COURT:  I'm not speaking to you right now, Mr.

18  Santiago.

19          MR. SANTIAGO:  Okay.

20          MR. SKIRTICH:  Respectfully, judge, no.  Because

21  there's no opinion as to the standard of care or the treatment

22  given by the prison medical staff or the private dermatologist

23  in New York.  I'm not even sure, I heard Mr. Santiago, I

24  respect what he represented, your Honor, but I'm unsure what

25  exactly Dr. Zeller wrote.  She does research, I believe, at

6

1  Columbia University in New York.  I'm not aware that she saw

2  the medical records in this case.

3          THE COURT:  Let me ask Mr. Devlin, are you familiar

4  with this letter he's talking about?

5          MR. DEVLIN:  Your Honor, I'm generally familiar with

6  it.  I do not have it right in front of me.  I know we reviewed

7  that and were aware of that.  We determined -- that we needed a

8  different medical professional, we felt we needed an additional

9  letter to this.  I wish I had the letter in front of me, I

10  apologize for not having that.

11          THE COURT:  I don't have it in front of me, either.

12          MR. SANTIAGO:  Your Honor, if I may.

13          THE COURT:  No, you may not.  You may when I tell

14  you.  Back to Mr. Devlin again.  Is that letter, would that

15  letter, I guess I'm asking a question that's somewhat unfair,

16  I don't have it in front of me -- do you have an opinion as to

17  whether that letter would suffice as an expert report?

18          MR. DEVLIN:  Your Honor, let me answer that this

19  way, if I may.  We believed that it was not sufficient, that we

20  needed something in addition.  I don't want to speak to the

21  court if Mr. Santiago were to choose to submit that.  I just

22  was handed a copy of the letter, I do not believe that Dr.

23  Zeller renders any opinions in a way that you would normally

24  see them in an expert report.  That's the reason why we went to

25  someone with whom we were more familiar in an attempt to do

7

1  that.

2          THE COURT:  Let me go to Mr. Santiago.  How many

3  days, I couldn't hear you the first time, Mr. Santiago, how

4  many days are you asking for to obtain and file an expert

5  report?

6        MR. SANTIAGO:  Okay, I would ask for 60 days.

7        THE COURT:  And from whom are you going to attempt

8   to obtain an expert report?

9        MR. SANTIAGO:  I'm going to contact Barbara Zeller.

10  She was the one that wrote the letter to the warden.  I have

11  that letter in front of me.  She was doing studies on the same

12  infection I had.  She mentioned it in the letter.  The letter

13  is Exhibit C31-A, I could use that letter as an expert report.

14       MR. SKIRTICH:  Judge, if I may.

15       MR. SANTIAGO:  That letter explains everything.  It

16  says they are currently the site of a study, on the same

17  infection that I had, at Columbia University.  She says in that

18  letter that she is the director of the long-term care facility

19  there.

20       THE COURT:  How long is the letter, is it one page?

21       MR. SANTIAGO:  It's two pages.

22       THE COURT:  Mr. Skirtich, do you have a copy of that

23  letter in front of you?

24       MR. SKIRTICH:  I do.

25       THE COURT:  Mr. Skirtich, would you be so kind as to

1  read it, at least the pertinent part to me, and slowly for the

2  court reporter, so I can make an independent determination now

3  as to whether that suffices as an expert report?

4          MR. SKIRTICH:  Yes.  The letter is dated January 2,

5  2004.  And it's addressed to the warden at McKean.  It starts

6  "I'm writing concerning the medical condition of Mr. Ernie

7  Santiago.  I was asked by his family to review his medical

8  records from McKean and offer any expert advice.  I am

9  currently the medical director of a long-term care facility for

10  immune suppressed people, and have been frequently confronted

11  with how to handle staphylococcal infections in this communal

12  setting.  We are currently the site of a study of resistant

13  staphylococcus infections in collaboration with Columbia

14  University.

15          I received medical records for Mr. Santiago dating

16  from 4/15/03 until 11/14/03.  The family was concerned about

17  non-healing sores on his lips that began in August 2003.

18          From the records, Mr. Santiago has a history of

19  longstanding eczema, which flared in late July.  In early

20  August he had sores on his lips and swelling around the left

21  eye. I explained to the family that from the records, the

22  diagnosis then and the medical care seemed thorough and

23  appropriate in this period. He was evaluated and treated for

24  both herpes and bacterial infection and cultured for both. The

25  etiology was found to be staphylococcus aureus, sensitive to

9

1  many antibiotics and resistant only to penicillin and

2  erythromycin. He received appropriate antibiotics and

3  improved. But worsened again on 8/18, and was treated with

4  another antibiotic, Cipro, on 8/26. This did not resolve the

5  symptoms and he was referred to an outside dermatologist, who

6  recommended appropriate interventions to determine if he was a

7  chronic nasal carrier of this bacterium and to try to eliminate

8  the infection with Bactoban. His nasal culture was negative.

9       However, the problem flared again in November with a

10  fever, eye swelling, and a purulent discharge from his lips.

11  This time he was treated with erythromycin, which was not the

12  correct choice because according to the prior culture, the

13  staph aureau would not be sensitive to this medication."

14       THE COURT: Read that sentence to me again, please?

15        MR. SKIRTICH:  "This time he was treated with

16  erythromycin, which was not the correct choice because

17  according to the prior culture, the staph aureau would not be

18  sensitive to this medication.

19        There were no further medical records.  However, the

20  family is worried because Mr. Santiago reports that he has not

21  improved and photos of him apparently show that he has not

22  improved.  In the photo, he had visible swelling around one eye

23  and sores on his lips.  I would be concerned that Mr. Santiago

24  has a more resistant strain of staphylococcus aureus.

25  According to the family, he was treated for a lung infection


10


1  last summer with vancomycin, intravenously.  This medication is

2  used for resistant organisms.

3        It is possible that Mr. Santiago has developed a

4  more resistant strain since the culture was obtained in August.

5        It would be important to repeat the culture of the

6  wounds, and blood cultures if he continues to have fevers.  If

7  he has more resistant staphylococcus, he most likely will need

8  to be hospitalized to receive intravenous medication.

9     There are infection control issues to be considered if he

10   carries resistant staphylococcus.  We isolate such cases until

11   the infection has cleared in order to avoid spread to other

12   individuals.

13         Hopefully, by now he has improved and these are not

14   current concerns."  Signed Dr. Barbara Zeller.

15         THE COURT:  All right.  Having heard the letter, in

16   my opinion that does not suffice as an expert report.  Because

17   the physician does not detail those instances where she finds a

18   deviation from the accepted standard of care, nor does she

19   express her opinions, although, it's more of a factual

20   narrative.  But to the extent anything could be viewed as an

21   opinion, it's not expressed to a reasonable degree of medical

22   certainty.  It's simply, in my view, more of a medical

23   narrative as to what she believes may have been going on.

24   Plus, it doesn't appear she had or has all the records.

25         All right, so now we're back to you, Mr. Santiago.

                                  11

1   When I say a medical expert report and this is for your benefit

2   in writing or speaking with the doctor, it will be necessary

3  for her to detail those instances, if she can, in which she

4  finds that the medical care that you received for your

5  infection fell below the accepted standard of care, number one.

6  Do you understand that?

7           MR. SANTIAGO:  Okay, yes.

8           THE COURT:  And, number two, it is necessary in the

9  expert report for her to express her opinions about the

10  deviation from the accepted standard of care to a reasonable

11  degree of medical certainty.

12           MR. SANTIAGO:  To express an opinion -- can you say

13  that again, please?

14           THE COURT:  I'm going to get you a copy of this

15  transcript.  It will be the best evidence as to what I said.

16  And then it's also necessary that a medical expert express an

17  opinion on causation.  And that is whether or not, if there was

18  medical malpractice, it resulted in injury or damage to you

19  that would not have been sustained but for the medical

20  malpractice.

21           Finally, medical experts are, in general, restricted

22  in their testimony to the four corners of the expert report.

23  So if she's going to produce an expert report, it's important

24  that she include in it everything that she would propose to

25  testify to.

                                    12


1        Now, that having been said, this is what I'm going

2   to do.  I have been down this road before recently in a case

3   called Nyhaus, N-y-h-a-u-s, versus United States.  I don't

4   remember if you were in that or not, Mr. Skirtich?

5        MR. SKIRTICH:  I was not, Jessica Smolar was.

6        THE COURT:  But, in any event, I am going, first of

7   all, with respect to Mr. Devlin, I appreciate the firm's

8   efforts, I'm going to grant your motion to withdraw on the

9   record, so you are now out.  As a matter of fact, you are

10  welcome to stay on the line, but you're also welcome not to

11  stay on the line.

12       MR. DEVLIN:  I'd be happy to stay on the line, your

13  Honor.

14       THE COURT:  And, Mr. Santiago, I am going to give

15  you 60 days from today within which to file an expert report

16  consistent with the parameters I discussed with you on the

17  phone a moment ago.  I think that's a reasonable amount of

18  time.

19          In the event -- I want to make that very clear on

20   the record -- in the event the expert report is not filed after

21   60 days, at that point, in light of the fact that the Knox firm

22   had attempted to obtain an expert through really the court's

23   intercession, and was unable to do so, in the event that that

24   report, your report, is not produced in 60 days, there will be

25   no further extensions for any circumstances and the case will

                                  13

1   be dismissed.  Let make it clear, summary judgment will be

2   granted in favor of the defendant and the case will be

3   dismissed with prejudice on the basis that you cannot proceed

4   in a medical malpractice case under Pennsylvania law without an

5   expert.  Do you understand that?

6          MR. SANTIAGO:  Yes.

7          THE COURT:  All right.  Is there anything further,

8   Mr. Skirtich?

9          MR. SKIRTICH:  There's one thing, judge, for the

10   record.  Just so it's complete and you know.  On January the

11   12th, 2004, a two-page detailed letter was sent to Dr. Zeller

12   by the warden at FCI McKean.  Where he recounted all of the

13  treatment that he had received up until that date.  At the end

14  of that letter it was indicated that was if Dr. Zeller required

15  any other additional information, that she had free access to

16  it as long as she called or wrote or contacted.  And to this

17  day Dr. Zeller never contacted the Bureau of Prisons.

18          THE COURT:  Was it initially the warden going in

19  search of --

20          MR. SKIRTICH:  No, it was in response to the letter

21  I just read to you.

22          THE COURT:  Okay.

23          MR. SKIRTICH:  And that letter was given to Mr.

24  Santiago, and it is in his documents he filed with the court,

25  so I know he has it and is aware of it.


                            14


1           MR. SANTIAGO:  Can I say something, your Honor?

2           THE COURT:  Yes.

3           MR. SANTIAGO:  Just because Mr. Skirtich mentioned

4  that, I do have the letter in front of me, I spoke to Mr.

5  Skirtich at our deposition, that had conflicted, as I showed

6  him, it mentioned I got medication after I came from the

7 dermatologist on one day, which was in fact not true. It was

8 not signed by the warden, it was signed by the assistant

9 warden, who was acting warden because the warden was leaving.

10        THE COURT: Those may or may not be issues for

11 another day. Mr. Santiago, the most important issue on the

12 front burner right now is to get your expert report.

13        Mr. Skirtich, may I assume you want a copy of this

14 transcript?

15        MR. SKIRTICH: Yes, your Honor.

16        THE COURT: Then my court reporter will prepare one

17 and send it out. Thank you, very much.

18

19        (Whereupon, at 10:31 a.m., the proceedings were

20 concluded.)

21

22                - - -

23

24

25

15

1        C E R T I F I C A T E

         - - - - - - - - - - -

2

3

4

5    I, Ronald J. Bench, certify that the foregoing is a

6  correct transcript from the record of proceedings in the

7  above-entitled matter.

8

9

10

11  _____

12  Ronald J. Bench

13

14

15

16

17

18

19

20

21

22

23

24

25